204 So.2d 188 (1967)
ERVING'S HATCHERIES, INC.
v.
Eugene THOMPSON.
No. 44542.
Supreme Court of Mississippi.
November 6, 1967.
Suggestion of Error Overruled December 4, 1967.
Wise, Carter & Child, Thomas G. Lilly, Jackson, Lomax B. Lamb, Jr., Marks, for appellant.
Satterfield, Shell, Williams & Buford, Jackson and Yazoo City, Gore & Gore, Marks, for appellee.
*189 JONES, Justice:
This is the second appearance of this case here. The appellant, Erving's Hatcheries, Inc., brought this action in the Circuit Court of Quitman County to recover damages resulting from the alleged negligence of the appellee, an attorney, in allowing the statute of limitations to run against a suit on an open account for $2500.00 due by William Johnson Garrott. We affirmed as to the liability of the appellee and remanded for trial on the question of damages. Thompson v. Erving's Hatcheries, Inc., 186 So.2d 756 (Miss. 1966). The lower court's judgment was in favor of the appellee on the retrial, and the Hatcheries appeal.
After remand of the case appellee filed an amended answer. The original declaration, on which the case was retried without amendment, charged that appellee, as a result of allowing the statute of limitations to run against an action against William Johnson Garrott, was indebted to appellant in the sum of $2500.00 balance due for 5,000 chickens purchased by Garrott from the appellant and that same was past due since July 1, 1959. In his amended answer, the appellee did not deny the account; but, as an affirmative defense, appellee alleged that the pullets were vastly inferior in quality, they were not what Garrott ordered, many were dead on delivery or died shortly afterward, and Garrott did not owe the amount claimed and had a valid claim in recoupment. It was also pled that Garrott was insolvent and that appellant lost nothing by any act of the appellee. Appellant filed a reply denying these affirmative defenses.
Testimony was introduced by appellant which established beyond doubt that Mr. Garrott was amply solvent for the purpose of this litigation. This evidence was not disputed, and at the conclusion of the trial, the court correctly instructed that Mr. Garrott's solvency and ability to pay the judgment, if obtained, had been established.
When the appellant rested, the lower court properly overruled appellee's motion to exclude and to grant a peremptory instruction.
The attorney for appellee then stated in the record that he desired to prove efforts at compromise between appellant and the purchaser, Garrott. He was probably induced to think this admissible by the statement in our previous opinion that there was evidence indicating insolvency of Mr. Garrott, together with negotiations and offers of settlement, and that there was proof Mr. Garrott denied liability because he alleged the pullets purchased were of inferior quality. The court properly sustained the objection to this evidence of attempted compromise. Our reference in the previous opinion to the efforts to settle and compromise was for the purpose of indicating there was probably substance to the defendant's claim, either of insolvency or breach of warranty.
Mr. Garrott, establishing an egg production business, had ordered 5,000 pullets from the appellant. He testified the chickens were due on June 25 at 5:00 a.m. One truckload of the chickens arrived at 8:00 a.m. with some of the chickens crippled. The next morning at 8:00, when the temperature was about one hundred degrees and the humidity excessive, the second truckload arrived with the chickens packed twelve or fifteen in a crate. The delay was due to mechanical failure of the truck. Mr. Garrott further testified that thirty-seven were crippled or suffocated; however, the chickens were unloaded and he accepted them. Sometime after their arrival the chickens went through a moult. He claimed that although egg production should have averaged 85 per cent, the best production achieved by these chickens was 71 per cent. He further testified that the mortality rate was high.
The invoice showed fifty extra chicks had been delivered, and this was not disputed.
*190 Mr. Garrott had never been in the commercial chicken business. His helper had never had experience in commercial chicken production, although he had raised about 500 at a time (not commercially). Mr. Garrott admitted that control and management are significant factors in the production of chickens. He later sold some of the chickens at what he termed a substantial sum. Mr. Garrott never at any time offered any estimate as to the difference in value of the chickens as ordered and as delivered; and his evidence as to the difference in their egg production and that of the average chicken, according to his testimony, was not inclusive of any reason as to the difference, if any, in the productivity. He thought there was a higher mortality rate than average, but no figures were shown as to the mortality rate of these chickens. Throughout the whole record the only testimony as to the amount of damages in dollars claimed to have been sustained was Mr. Garrott's statement that "he did not think he owed the $2500," and there was actually no substantial proof as to inferiority of the quality of the chickens  no more than a scintilla, if that.
Appellant called Mr. Royce Welbourn in rebuttal. In June 1959 Mr. Welbourn was working as a sales representative and service man for General Mills, which had rendered financial aid to Garrott to help establish his egg business. He was reared on a farm and after World War II attended Mississippi State College, his major fields of study being agricultural economics and marketing. He also took several courses in poultry and related subjects. Mr. Welbourn taught about two years after finishing college and had about eleven years of practical experience. He saw the second load of the chickens delivered to Mr. Garrott. He said they were delivered in the conventional manner. He was looking at them because his company was to finance the feed until they were in production and would pay their own way, plus advancing the Hatcheries an initial payment on the birds. It was summer when the chickens were delivered; they were shipped in wood chicken coops. He stated chickens shipped that distance are all right if they get up and eat and drink within a short time and do the same the next day, regardless of ruffling their feathers. He said they all look ragged  "All I ever saw that was handled that way did." He could not see anything physically wrong with the chickens. Since Mr. Garrott had never raised chickens commercially, Mr. Welbourn went by there on an average of once every two weeks and sometimes more often (rather than the usual thirty days). Before General Mills took title on those particular birds, he observed them for a week or so. "We thought the birds would meet the qualifications they were warranted to be at that time." He checked egg production from time to time and was asked if the production of Mr. Garrott's chickens was below normal. He would not say so. These chickens arrived at a time of the year when people do not want them to come into production because of the hot weather and higher prices in the fall. He was called one time and told the chickens were off production about thirty days after they were delivered. He found the feed in the mechanical feeders was not deep enough, so he adjusted the feeders to let more pass out of the hopper, and the birds picked up in production. He says this was an average bunch of chickens.
Mr. Welbourn was asked if 85 per cent production was considered normal. His answer was that it might be today (time of trial), but this was in 1959. "We used to figure back then that if you got from eighteen to twenty dozen eggs a year out of a year out of a hen you had a darn good laying hen." That should be 66 2/3 per cent production on a year's basis. In January 1960, about six months after the purchase, a laboratory test was made on some of the chickens. The examination was made in Jackson at the Veterinary Diagnostic Laboratory.
Mr. Jack Mullen, an employee of Erving's Hatcheries, Inc., testified that in January *191 1960 he was asked by the Hatcheries to visit Mr. Garrott's farm to investigate the condition of the flock. He testified that the chickens appeared to be in good condition, but there was indication of some secondary disease. The chicken house was built on level ground with no fill; the floor was wet and damp and did not have much litter on it. He said these were indications of poor management. When such conditions produced a secondary infection of any kind, the chickens would not be able to produce to their potential.
Dr. J.W. Branson, associate pathologist of the Veterinary Diagnostic Laboratory in Jackson, said these chickens were brought to him in January 1960. He stated that an autopsy he found "they had catarrhal enteritis, cloudy airsacs, and an excessive amount of bacterial infection, which we interpreted as being lesions of infectious bronchitis in two of the birds." Those symptoms, according to the doctor, are the usual symptoms of mismanagement in birds. He testified, "We see it every day, and it is a common set of symptoms or results of mismanagement." He says mismanagement is evidenced by a lack of the following: controlling the airflow by the proper placing of curtains in the winter months, cleaning up the water properly, feeding birds sufficiently deep in the feed troughs, keeping the litter dry, and maintaining it in the proper condition and depth. He said there was nothing indicating anything wrong with the breed of the chickens; and if the chickens had been damaged due to some stress or strain due to excessive heat, which is probably all that would result from a delayed shipment, it would show within two days at most and possibly within twenty-four hours. Any damage suffered would be overcome in two weeks. If the chickens were alive and could eat and drink, any damage suffered during the shipment would be strictly temporary; incubation time of any disease under such circumstances would be probably within fourteen days  three weeks at the outside. He further stated that moult is natural and will occur about four times. It will begin about three weeks before production, and it would be unusual if a chicken did not moult when twenty or twenty-four weeks old.
On the last element, the issue of the breach of warranty, a decision as to the burden of proof will be decisive. As heretofore stated, we do not think the evidence amounted to a scintilla as to a breach of warranty, and there was no evidence at all as to the amount of damages sustained, if any. The statement by Garrott that he did not think he owed the appellant anything could not be construed as an evaluation of the damages themselves. There was no evidence by which the amount of damages could be found with any degree of certainty or reasonableness.
In the former case we cited from 7 Am.Jur.2d Attorneys at Law section 188 at 156 (1963) holding that the client has the burden of proving (1) the existence of the relationship of attorney and client, (2) the acts constituting the alleged negligence, (3) that the negligence was the proximate cause of the injury, and (4) the fact and extent of the injury alleged. It was there said, "The last element mentioned often involves the burden of showing that, but for the negligence of the attorney, the client would have been successful in the prosecution or defense of an action."
Of course, the question of the solvency or insolvency of the debtor is involved in every debtor case. In tort cases the question of negligence or non-negligence is always present. However, there are many defenses that cannot possibly be anticipated by the client. We are of the opinion the defense of breach of warranty might be one such defense and that the statement above quoted from American Jurisprudence 2d might not be applicable. We do not think it is imperative, however, to pass upon this issue because the appellee, evidently feeling that said statement did not include a defense of this sort, pled breach of warranty as an affirmative defense, thereby assuming the burden of establishing *192 such defense. As heretofore stated, the evidence failed to meet the burden, and a peremptory instruction for the plaintiff should have been given.
The appellant sought to recover the court costs expended in its original case against the debtor, in the case against appellee, which was reversed here, and in the present case. The lower court properly held that the costs in the case which was appealed to this Court and reversed should not be taxed against appellee.
This case is affirmed on cross-appeal, and on direct appeal is reversed and judgment entered here for appellant in the amount of $2500.00 plus six percent interest per annum from July 1, 1959, together with $48.25 costs in the original case.
Affirmed on cross-appeal; reversed on direct appeal and judgment rendered for appellant.
GILLESPIE, P.J. RODGERS, BRADY, and INZER, JJ., concur.